# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Bernard Zalman and Sandra Zalman, : 
his Wife, : 
 : 
               Appellants : 
        v. :   No. 1030 C.D. 2016
 :   Submitted: February 9, 2017
City of Chester : 

Bernard Zalman and Sandra Zalman, : 
h/w : 
 : 
        v. :   No. 1383 C.D. 2016
 :   Submitted: February 9, 2017
City of Chester : 
            Appellant : 

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE JOSEPH M. COSGROVE, Judge
            HONORABLE JAMES GARDNER COLINS, Senior Judge

**OPINION BY**
**SENIOR JUDGE COLINS**              **FILED: June 27, 2017**

Bernard Zalman and Sandra Zalman, who are the designated Appellants (collectively Appellants), and the City of Chester[1], cross-appeal from an order issued on November 9, 2015 by the Court of Common Pleas of Delaware County (Trial Court) quieting title to a portion of Yarnall Street and a portion of West Front Street located within Chester. Based upon the following reasons and the able and learned opinion issued by Judge Spiros E. Angelos of the Trial Court, we affirm the Trial Court's order.

---

[1] References within this opinion to the "City" refer to the City of Chester as a party to this appeal, while references to "Chester" refer to the City of Chester as the location of the property in dispute.

Yarnall Street and West Front Street intersect within Chester in an area along the Delaware River near the Commodore Barry Bridge that was previously dominated by railroad tracks and industry and is now a street away from the stadium that is home to the Philadelphia Union pro soccer team. An elevated off-ramp from U.S. Route 322 creates a semi-circle above the area at issue and allows cars to exit onto West Second Street. After the off-ramp, Yarnall Street is the first street that crosses West Second Street and goes toward the river. As Yarnall Street heads toward the river, Appellants' first property is located on the northwest side of where Yarnall Street intersects with West Front Street and Appellants' second property is located on the southwest side of where Yarnall Street intersects with West Front Street. Appellant Bernard Zalman has operated a business at the northwest and southwest corner of Yarnall and West Front Street since 1956.

Appellants filed a quiet title action to determine whether Appellants or the City were the legal owners of portions of Yarnall and West Front Streets. Following a non-jury trial, the Trial Court issued an order concluding that title to that portion of West Front Street that abuts Appellants' property belongs to the City and that title to "the western half of Yarnall Street as it stretches from the southern edge of the intersection of West Front Street and Yarnall Street south to the southern boundary of [Appellants'] property located at the southwest corner of Yarnall and West Front Street," belongs to Appellants.

Both Appellants and the City appealed the Trial Court's order to this Court and each requests that this Court affirm that portion of the Trial Court's order which quiets title in their favor and reverse that portion of the Trial Court's

order which quiets title in the other party's favor.[2]  Appellants argue that the Trial Court abused its discretion by concluding that the evidence demonstrated that West Front Street was dedicated, opened, and used by the public prior to passage of the Act of May 9, 1889, P.L. 173 (Act of 1889), 36 P.S. § 1961, and that, therefore, the 21-year statute of limitations set forth in the Act of 1889 is inapplicable to the portion of West Front Street in dispute.  The City argues that the Trial Court abused its discretion by concluding that the City had vacated the portion of Yarnall Street in dispute where the City did not pass an ordinance expressly vacating the street.  We will address these issues seriately.

Appellants argue the record demonstrates that the Borough of South Chester[3] granted the right to construct a freight railway line across private property on what is now West Front Street prior to any plotting, laying out or opening of West Front Street.  As a result, Appellants argue there was no dedication or acceptance of West Front Street by the Borough of South Chester, which was later incorporated into Chester.  Appellants argue that there is no evidence in the record that West Front Street was used by the public prior to passage of the Act of 1889 and Appellants, therefore, contend that there is no support in the record for the Trial Court's Finding of Fact No. 11.  Finding of Fact No. 11 states:

> It has been specifically held that 36 P.S. § 1961 does not
> apply retroactively to a street that was in use at least by

[2] This Court's scope of review of the denial of post-trial motions is limited to determining whether the trial court abused its discretion or committed an error of law. *Hunter v. City of Philadelphia*, 80 A.3d 533, 536 n.7 (Pa. Cmwlth. 2013). An appellate court may not substitute its judgment for that of the trial court where the determination of the trial court is supported by competent evidence. *Pirillo v. Vanco*, 74 A.3d 366, 368 n.5 (Pa. Cmwlth. 2013).  Where the issues presented are pure questions of law, our standard of review is *de novo* and our scope of review is plenary. *Id*.

[3] The Borough of South Chester was incorporated into Chester in 1921.

railroads. *City of Pittsburgh v. Pittsburgh & L. E. R. Co.,* 106 A. 724, 726 (Pa. 1919).

(Trial Court Op., ¶11.)  The City argues that the cases relied upon by Appellants for historical evidence, including *Borough of South Chester v. Chester and Delaware River Railroad Co.*, 5 Del. Co. Rep. 114 (Del. Cmm. Pls. 1892), and *Chester and Delaware River Railroad Co. v. South Chester Railroad Co.*, 5 Del. Co. Rep. 153 (Del. Cmm. Pls. 1892), as well as the 1913 and 1934 "Sanbourn Maps"[4] offered as exhibits by the City, support the City's argument and the Trial Court's conclusion that West Front Street was a public street by at least 1892, rendering the Act of 1889 inapplicable to Appellants' quiet title claim.

The three essential elements that must be satisfied to demonstrate that a street has been opened for public use are: (1) a grant or dedication that is express or implied; (2) an acceptance; and (3) an opening or public use.  *Borough of Leighton v. Katz*, 462 A.2d 889, 892 (Pa. Cmwlth. 1983).  Per the Act of 1889, the General Assembly set forth the following statutory provision applicable to unopened ways or streets on town plots:

> Any street, lane or alley, laid out by any person or persons in any village or town plot or plan of lots, on lands owned by such person or persons in case the same has not been opened to, or used by, the public for twenty-one years next after the laying out of the same, shall be and have no force and effect and shall not be opened, without the consent of the owner or owners of the land on which the same has been, or shall be, laid out.

---

[4] "Sanbourn Maps" were originally created as fire insurance risk maps and show structures and the type of material used in the structure.  Today these maps are commonly used by engineers and planners to identify the historical use of property.

36 P.S. § 1961. As early as 1896, our Supreme Court stated that "[t]he purpose of the act is to relieve land upon which streets have been laid out by the owner, but not opened or used for 21 years, from the servitude imposed." *Quicksall v. City of Philadelphia*, 35 A. 606, 609 (Pa. 1896). In *Quicksall*, the Court concluded that the Act of 1889 prevented a street laid out and dedicated in 1848 from being opened and used by the public without compensation because for the preceding 44 years the street had been exclusively within the possession of the abutting owners and used by them for stone quarrying and it was, therefore, too late for the city to assert a right founded on the dedication in 1848.

However, the Court also concluded that the Act of 1889 had no retroactive effect, stating that "[t]here is nothing in this statute that would justify us in giving it a retroactive construction, so as to apply to streets opened and used prior to its passage." *Osterheldt v. City of Philadelphia,* 45 A. 923, 923 (Pa. 1900). In *Osterheldt*, a deed from Richard Peters to Frederick Osterheldt in 1849 contained a dedication for public use of a strip of land owned by Peters that had also been stamped as a public street on the plat recorded by Peters. At some point between 1865 and 1870, Osterheldt erected fencing enclosing 25 feet of the strip of land laid out and dedicated by Peters as a public street. In 1884, city council passed an ordinance opening "Fairmount Avenue" with a width of 50 feet. The street now known as Fairmount Avenue included the strip of land identified as a public street in the deed from Peters to Osterheldt that Osterheldt had enclosed with fencing. Osterheldt's heirs brought an action for damages against the city and the Court held that the deed from Peters to Osterheldt in 1849 operated as a relinquishment of all claims for damages for the use of the land within the line of

5

Fairmount Avenue and that, because the Act of 1889 had no application, Osterheldt's heirs had no claim for damages. *Id*. at 923.

Clarifying application of the Act of 1889 further, the Court held in *In re Widening of State Road*, 84 A. 686 (Pa. 1912), that the Act applied only to new streets laid out by owners but not opened or used by the public for the subsequent 21 years and that the Act had no application to the widening of a road to include land previously dedicated as a part of a public highway. *Id*. at 687. In *State Road*, an owner of a large tract of land executed a deed and recorded a plan subdividing the tract into lots and streets including Aramingo Street, which was recorded as being 60 feet wide although only 50 feet was currently being used by the public. Purchasers of the surrounding tracts subsequently built fences along the bed of Aramingo Street, enclosing the 10 unused feet of the plotted roadway. The Court concluded that the public actually used and continued to use Aramingo Street after its dedication and that, even though the public did not use the entire width dedicated, public use of any part of the road was sufficient to establish acceptance of the entire width of the road dedicated. *Id*. at 687.

The Court addressed the effect of use of a street by the railroads on the issue of whether a street was a public street in *City of Pittsburgh v. Pittsburgh & L. E. R. Co.*, 106 A. 724 (Pa. 1919). In *Pittsburgh & L. E. R. Co.*, the city filed a bill in equity to remove encroachments by abutting property owners on an alleged public street, known as South Water Street, which stretched from Seventeenth to Twenty-Sixth Street within the City of Pittsburgh. The area where the alleged street was located was originally developed from two tracts of land on the southern bank of the Monongahela River, the eastern part being owned by Oliver Ormsby and the western part being owned by John Ormsby, which were partitioned by the

6

Orphans Court in 1841 and 1844. A third tract, which lay between the two Ormsby tracts, was determined to belong to Oliver Ormsby and partitioned in 1844. The Court found that "[n]umerous streets are referred to in the partition proceedings and shown on plots accompanying the same, including Water street represented as of the width of 100 feet, more or less, and extending to the river. Subsequently much of the property was subdivided and passed by sundry conveyances wherein Water street is referred to and called for as a boundary, and some buildings were erected abutting upon the south line thereof." *Id*. at 725.

At the time of the partitions, there was an open coal mine from which a railroad extended to the river along what became Twenty-First Street, and on the western side of Twenty-First Street there was a block of lots known as the "railroad lots." The first two partitions, in 1841 and 1844, did not extend Water Street across the railroad lots; the third partition, in 1844, showed Water Street extending across the railroad lots and included as signatories all abutting landowners. In 1849, the borough of East Birmingham, which included all of the land originally comprised of the Ormsby tracts, was incorporated by the General Assembly. Section 15 of the Act provided that the owners of the railroad lots retained ownership of the lots to the low water mark of the river, "[p]rovided, that in all such cases there shall be secured to the public a right of way along the river bank across such lot or lots." *Id.* at 726. Following incorporation, Water Street was referred to in numerous borough ordinances and one ordinance referenced fixing and grading the street. The borough of East Birmingham became part of the City of Pittsburgh in 1872 and in 1878 the city "granted a franchise to the Pittsburgh & Lake Erie Railroad Company to construct a line of railway upon and along said street, and later granted additional franchises to railroad companies to

7

construct tracks therein, which was done; and the tracks so constructed have been in constant use upon the streets here in question for over 30 years." *Id.*

The Court found that the area along the river and around Water Street had been widely used since the original partition and that the city had established wharfage charges, although collection was unsuccessful, as well as made expenditures in the construction and care of the wharves along Water Street, but that Water Street was never formally opened as such or improved as a street. However, the Court also found that:

> It has been used more or less by pedestrians since 1847, and some parts of it also by vehicles, largely in transportation to and from the wharves and other establishments above mentioned. A washout near Eighteenth street has for many years prevented the use of that part of Water street, and further east (up the river) it has always been to some extent obstructed by fences and other obstacles; the part most used for teaming being between Nineteenth and Twenty-Second streets. The railroads in Water street are constructed largely upon trestles, and so far as they occupy space prevent traffic by other vehicles.

*Id.* Based on this evidence, the Court first concluded that "[t]he several partitions showing blocks and streets, including Water street, constituted a dedication of the latter to public use, especially when followed by the many conveyances made with reference thereto. While Water street was not extended across the railroad lots by the first or second partition, we agree with the chancellor that it was by the third." *Id.* at 727. Having confirmed that Water Street had been dedicated, the Court went on to conclude that the dedication had been accepted, stating:

> In our opinion the acts of the borough and city in making reference to Water street in numerous ordinances,

8

> establishing the grade thereof, dumping of earth thereon, building and repairing wharves within its lines, and granting franchises to railroad companies to lay and operate tracks therein constitute an acceptance of the dedication. And we are still of the opinion expressed in *McKee v. Penna. R. R. Co.*, [100 A. 454 (Pa. 1917)], that the city's granting permission to the railway companies to construct and operate tracks in Water street constituted an acceptance of the dedication. *See Philadelphia v. Thomas' Heirs*, [25 A. 873 (Pa. 1893)]. Of course public use alone will constitute an acceptance of a dedicated street, but we do not base the decision upon that ground because of the question as to the extent of such use.

*Id*. Finally, the Court concluded that the Act of 1889 did not apply because Water Street had been accepted by the municipality and "was in use at least by the railroad companies, which was a public use, before the passage of the act." *Id*.

Appellants contend that because the railway constructed in the instant matter was a freight railway or contract carrier, it did not constitute a public use like the street railway constructed on Water Street and found determinative in *Pittsburgh & L. E. R. Co.*, and therefore the three essential elements necessary to open a street to public use were not present prior to the Act of 1889. In support of their argument that a freight railway does not constitute a public use, Appellants rely upon *White v. Smith*, 42 A. 125 (Pa. 1899), where our Supreme Court examined whether the City of McKeesport properly seized and sold for taxes the personal property used in a public school building maintained by St. Peter's Roman Catholic Church. In determining that a tax was not properly levied on the convent building because it was a part of a purely public charity, the Court quoted from *Appeal of Donohugh*, *affirmed per curiam* by 5 W.N.C. (Pa. 1878), where Justice Mitchell, sitting in the Philadelphia County Court of Common Pleas, stated that:

9

> The essential feature of a public use is that it is not confined to privileged individuals, but is open to the indefinite public. It is this indefinite or unrestricted quality that gives it its public character. The smallest street in the smallest village is a public highway of the Commonwealth, and none the less so because a vast majority of the citizens will certainly never derive any benefit from its use. It is enough that they may do so if they choose.

*White v. Smith*, 42 A. at 126. In addition, Appellants rely upon *Phillips v. Public Service Commission*, 191 A. 641 (Pa. Super. 1937), wherein the Superior Court, relying in part on *White v. Smith*, held that an owner of three trucks and a trailer hauling freight for three customers under contract was not a common carrier of freight required to obtain a certificate of public convenience in order to operate. In articulating the proper analysis for determining whether a transporter of goods was a common carrier, the Superior Court in *Phillips* quoted in part from *Lloyd v. Haugh & Keenan Storage & Transfer Co.*, 72 A. 516, 517 (Pa. 1909), and stated:

> As our Supreme Court has said, "we express a doctrine universally sanctioned when we say that any one who holds himself out to the public as ready to undertake for hire or reward the transportation of goods from place to place, and so invites custom of the public, is in the estimation of the law a common carrier." The character of the service may be exhibited both by actually rendering service and by an offer to furnish service, that is, by the manner in which the carrier holds himself out to the public.

*Phillips*, 191 A. at 643 (internal citation omitted). While the premise upon which Appellants' argument is based—that not all use of a street by the railroads amounts to a public use—has merit, the Trial Court found and the record supports the

finding that the portion of West Front Street that Appellants claim title to was dedicated, accepted, and opened to public use prior to the Act of 1889. Appellants focus their argument on the early history of the creation of the railroad along the river in Chester discussed in *Borough of South Chester v. Chester and Delaware River Railroad Co.*, 5 Del. Co. Rep. 114 (Del. Cmm. Pls. 1892) (*Borough of South Chester I*). The chief issue in *Borough of South Chester I*, is the extent of the power granted by the Commonwealth to a railroad corporation by a charter for a franchise to construct a railway within a municipality and the remedies available to a municipality where it is alleged that the power has been exercised beyond what was granted by the charter. At the start of the opinion, the trial judge states that as of 1892:

> South Chester is one of the largest and most flourishing boroughs in the State. It has a population approaching 10,000 inhabitants. It has millions of dollars invested in its manufacturing industries. It has, at great expense, surveyed, laid out, adopted, graded and regulated a system of streets, two of which are curbed and paved for a distance of nearly two miles. Third Street was graded and paved at an expense of $80,000. The borough is supplied with water and gas, and has a system of sewerage. No stranger visiting the city of Chester could tell where the city ends and the borough begins. The streets of the borough are all laid out and graded so as to conform to the general plan of the city of Chester, of which the borough must necessarily soon become a part.

5 Del. Co. Rep. at 115. However, later in the opinion the trial judge discusses the history of the development of the railroad and the borough, stating:

11

> The first ordinance under which the defendant claims to take this street was passed June 6, 1870. The borough had hardly been organized. No system of streets had been surveyed, laid out or adopted. The population did not then exceed five hundred inhabitants. Nearly all the land over which the proposed road was to be built then belonged to the Hon. John M. Broomall. The suggestion came from the P. W. & B. R. R. Company and the clear understanding was that the road was to be built at once to encourage manufacturers to locate in the borough, not after they had located there. For some unknown reason, perhaps the want of branching power, the P. W. & B. R. R. Company refused to build the road and Mr. Broomall procured the same privileges by the second ordinance, and actually built the road. It was a very primitive construction, not over twelve feet wide, but it answered its purposes and was patronized by perhaps one freight car a week. After the company was incorporated, it procured the passage of the Act of 1873, which I construe merely to confirm what had been done, the road then having been fully completed and, I suppose, approved by the street committee. The second section of this Act was intended to authorize the borough and railroad company to agree upon future extensions and improvements.

*Id*. at 121. Appellants contend that this history of the development of the railroad, particularly the fact that it was built by the Hon. John Broomall on land he owned, constructed prior to an adoption by the Borough of South Chester of a system of streets, and that the line was used solely for commercial purposes demonstrates that it was never opened for public use and therefore, the fact that the line traversed the portion of West Front Street at issue was not competent evidence of public use. Appellants' interpretation of *Borough of South Chester I*, with its focus on the history of the railway construction in the 1870s, overlooks the trial judge's earlier discussion of the railway and the streets of the Borough of South Chester in 1892

12

and the context within which all of this factual history takes place—a bill in equity seeking to enjoin the company incorporated by the Hon. John Broomall, Chester and Delaware River Railroad Co., and the South Chester Railroad Co., from abusing their charter privileges and creating a public nuisance by preventing safe passage by the public at large along the streets and sidewalks of the Borough and flouting Borough regulation. *Id*. at 115-116, 118. The Court held in *Borough of South Chester I* that:

> Both of the defendant railroads are upon an equal footing, as to their right to use and occupy the streets of the borough of South Chester…that the proper person to be consulted and the terms to be agreed upon for the exercise of their charter privileges of using said streets in a reasonable manner, is the borough of South Chester, and until such location and reasonable conditions are agreed upon the injunction shall issue restraining both of said companies from any use of, or interference with said street.

*Id*. at 125-126. Whether in the year 1892 or 2017, an injunction sought by a municipality to prevent private corporations from using private land in a manner that excludes competition and the public at large from use of that land would not issue; the bill in equity and the injunction that issued in *Borough of South Chester I* necessarily stand on the condition precedent that the public has a right to use of the streets.

Furthermore, while Appellants set forth the analysis applicable to an examination of whether a carrier is a common carrier or a contract carrier, attempting to use the distinction as a means to distinguish the freight railroad originally constructed by the Hon. John Broomall from the railway found to

13

support public use in *Pittsburgh & L. E. R. Co.*, they do not set forth facts to demonstrate that the freight railway was not a common carrier, simply noting that it was commercial in character and meant to attract and serve businesses along the waterfront. The railway along Water Street in *Pittsburgh & L. E. R. Co.* originally transported coal but this fact did not detract from the Court's finding that the existence of the railroad supported the conclusion that the street was in public use. Appellants' argument is unsupported by facts gleaned from *Borough of South Chester I* that show the railroad constructed on West Front Street was limited to use by a privileged few and not held out to the public at large as ready for use, or that the area within West Front Street beyond the tracks was not open to the public for use.

        *Chester and Delaware River Railroad Co. v. South Chester Railroad Co.*, 5 Del. Co. Rep. 153 (Del. Cmm. Pls. 1892) (*Borough of South Chester II*) provides further support for the Trial Court's conclusion that the portion of West Front Street at issue was opened to the public. *Borough of South Chester II* was an attempt by the railroad companies to re-litigate the issues in *Borough of South Chester I.* 5 Del. Co. Rep. at 153. The opinion is replete with references to the obstruction of public use and safe passage across the streets of the Borough, Front Street in particular, by the ongoing war between the railroads because each company was damaging the roads in order to obstruct the other company from laying its tracks. *Id.* at 154-155, 158. In concluding that the injunction issued earlier in the year in the Borough's favor would stand and a special injunction favoring one or the other of the railroad companies would not issue, the trial judge stated that the Chester and Delaware River Railroad Company had "no right to unnecessarily obstruct the remaining part of the street for the purpose of depriving

14

any other rival [tracks] of its use. Neither have they the right to destroy the street for public travel, only so far as the line adopted will, from necessity, destroy it." *Id*. at 155. In addition, the trial judge concluded that if the railroad company had the powers it claimed of appropriating the whole street, then the company would have to condemn it and pay for its exercise of eminent domain; from this conclusion, it necessarily follows that the land in question was used by the public, for otherwise eminent domain would not have been a part of the court's calculus. *Id*. at 156. Moreover, in reaching its conclusion, the court noted that the Chester and Delaware River Railroad Company had the right to carry freight as well as passengers, which undercuts Appellants' attempt to distinguish *Pittsburgh & L. E. R. Co*. from the instant matter.

*Borough of South Chester I* and *Borough of South Chester II* both support the conclusion that the portion of West Front Street at issue was opened for public use before the 21-year statute of limitations in the Act of 1889, which our Supreme Court long ago made clear has no retroactive effect. The Trial Court did not err in concluding that Appellants failed to demonstrate clear title to the subject portion of West Front Street.

Next, the City argues that it was error for the Trial Court to conclude that Yarnall Street had been vacated where the record demonstrated that City Council had not passed an ordinance vacating the street. Specifically, the City contends that the Trial Court erred by relying on *Hasenflu v. Commonwealth*, 179 A.2d 216 (Pa. 1962), to conclude that there is an exception to the general rule that the city council of a municipality must pass an ordinance to vacate a street "where city council passes an ordinance that results in the barricade of a particular street to prevent vehicular traffic and the street is then actually closed." (Trial Court Op.,

¶19.) The City also argues that the Trial Court erred by not applying the Rules of Statutory Construction in its analysis of the Ordinance passed by City Council.

Generally, a municipality may vacate a street by ordinance where the ordinance is affirmed by a three-fourth vote of the elected council, approved by the mayor and where proper notice procedures have been followed. Section Nine of the Act of May 16, 1891, P.L. 75, *as amended*, 53 P.S. § 1672[5]; *see generally In re City of Altoona*, 388 A.2d 313 (Pa. 1978). However, this rule is not without exceptions. In *Hasenflu*, our Supreme Court examined whether the court below erred by denying a landowner a new trial in an eminent domain proceeding. The land at issue was bounded on the west side by Walnut Street, a public highway of the City of Sharon. The landowner argued that a portion of Walnut Street had been closed and reverted to his ownership and that the construction plans for Walnut Street constituted a taking of that reversionary interest for which he was due just compensation. The City of Sharon argued that the portion of Walnut Street had never been legally vacated so there could be no taking. The record showed that a barrier had been erected preventing vehicular traffic from traveling on the portion of Walnut Street at issue, that the construction plans for the surrounding streets by the Commonwealth had called for closing Walnut Street and erecting barriers, and that the City of Sharon had approved this plan by ordinance. *Id*. at 220. The Court concluded that the trial court erred in instructing the jury that there had been no evidence of a legal street closing, stating:

---

[5] *See also* Act of May 23, 1907, P.L. 223, § 1 (copy of ordinance to be filed; manner of indexing title) & § 2 (fees of recorder), Act of May 21, 1905, P.L. 46 § 1 , *as amended* (power of municipalities) & § 2 (proceedings as now provided), Act of April 6, 1949, P.L. 394 § 2 (validation of street vacations), Act of March 30, 1922, P.L. 30 § 1 (time for enforcement) & 2 (effect of expiration of time), Act of April 7, 1927, P.L. 169 § 1 (limitations of actions) & § 2 (designation of no effect one year after being closed), 53 P.S. §§ 1941-1949.

> Despite this approval by councilmanic action of the construction plan one of the details of which would close a portion of Walnut Street, the Commonwealth argues that, before a legal vacation of any portion of Walnut Street could take place, the City council had to pass an ordinance specifically declaring the vacation of the street. As a general rule such councilmanic action is requisite but our courts have very soundly recognized exceptions to this rule. *Wetherill v. Pennsylvania Railroad Company et al.*, [45 A. 658 (Pa. 1900)]; *Carpenter v. Pennsylvania Railroad Co.*, [45 A. 685 (Pa. 1900)]; *[In re] Butler Street*, 25 Pa.Super. 357 [Pa. Super. 1903]. The instant factual situation is an exception to the rule. Here we have municipal approval by ordinance of this plan of construction which portrays a closing of a portion of Walnut Street followed by an actual physical closing of such portion of the street. Both clearly manifest the municipal will. In charging the jury that there was no evidence of a 'legal closing' of this portion of Walnut Street the trial court erred.

*Id*. The City argues that the facts of *Hasenflu* are inapposite because in the instant matter the street was only closed to vehicular traffic, the closing did not involve the erection of permanent barriers, and the closing did not involve a construction plan approved by city council but an Ordinance passed that explicitly closed the street to vehicular traffic. Essentially, the City contends that rather than depend on evidence of the "municipal will," as the Court did in *Hasenflu*, the Trial Court has allowed Appellants to take a public street by permissive possession.

When Appellant Bernard Zalman located his business at Yarnall and West Front Streets, a railroad line remained on West Front Street and the surrounding area was nothing but mud. (October 5, 2015 Hearing Transcipt (H.T.) at 21, 23.) In 1956, Bernard Zalman constructed a new building on the southwest corner of Yarnall Street. (*Id.* at 26.) Sometime in the 1960s, the railroad tracks

17

were removed, leaving mud and holes where the ties had been taken up on West Front Street. (*Id*. at 24.) From the 1960s until present day, the City has not improved West Front Street or Yarnall Street. (*Id*. at 25.) During Mr. Zalman's ownership of his properties abutting Yarnall Street, he testified that the area "was just mud and people dumping trash all over the area." (*Id*. at 27.) At some point in time, a portion of Yarnall Street from West Front Street to West Second Street/ Pennsylvania Route 291 was improved with pavement but there was no evidence concerning the entity that did the paving. (*Id*. at 28.) However, the paving fell into disrepair and Mr. Zalman testified that "there were holes and everything in it. In order to run on it I had to put down plates, seal plates in order to go on that section of it." (*Id*. at 29.) He further testified that due to the rampant short dumping in the area, a vermin problem developed, and he was forced to clean up the area at his own expense. (*Id*. at 31.) In response to the short dumping, Appellant Bernard Zalman testified that the City advised him to close up the street. (*Id*.)

On or about December 14, 1983, the City passed an Ordinance closing the portion of Yarnall Street at issue to vehicular traffic, which was published in the City's index of vacated streets. (Trial Court Op. ¶20; *see also* Exhibits P-3 & P-4 (Table of Special Ordinances Vacating Streets).) The City also vacated or closed several adjacent segments of streets surrounding the intersection of West Front Street and Yarnall Street. (Exhibit P-4; *see also* H.T. at 88.) The City then provided Appellants with steel beams and pipes so that they could physically close the road. (*Id*. at 32.) In or about 2009 to 2010, the Pennsylvania Department of Transportation constructed new ramps from the Commodore Barry Bridge to Route 291, and Mr. Zalman testified that during the construction the balance of

18

Yarnall Street from Route 291 to West Front Street was destroyed by the heavy trucks used by the Commonwealth. (*Id*. at 31, 33.)

Based on the record before the Trial Court, we agree that title to the subject portion of Yarnall Street is controlled by the exception articulated by our Supreme Court in *Hasenflu* and is not an issue of Statutory Construction. Although the Sanbourn Maps submitted into evidence by the City show that prior to the creation of Yarnall Street, the predecessor street, Morton Street, contained residential houses on the eastern side and that these homes were serviced by utilities that today are public, the Trial Court did not find this evidence persuasive. Instead, the Trial Court concluded and the record supports the conclusion that closing of the subject portion of Yarnall Street by Ordinance, preceded by the lengthy abandonment of the area and followed by the actual physical barricading of the subject portion of Yarnall Street, amounts to a *de facto* vacation of the street by municipal will. Furthermore, although not determinative because of the controlling nature of *Hasenflu*, the record does not show that the subject portion of Yarnall Street was ever properly opened to the public.

Accordingly, we discern no error and affirm the order of the Trial Court *in toto*.

_____
**JAMES GARDNER COLINS, Senior Judge**

19

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Bernard Zalman and Sandra Zalman, his Wife, | : | |
| | : | |
| | : | |
| Appellants | : | |
| v. | : | No. 1030 C.D. 2016 |
| | : | |
| City of Chester | : | |
| | | |
| Bernard Zalman and Sandra Zalman, h/w | : | |
| | : | |
| | : | |
| v. | : | No. 1383 C.D. 2016 |
| | : | |
| City of Chester | : | |
| Appellant | : | |

## O R D E R

AND NOW, this 27th day of June, 2017, the order of the Delaware County Court of Common Pleas in the above-captioned matters is AFFIRMED.

_____
**JAMES GARDNER COLINS, Senior Judge**